**GENERAL MOTORS CORPORATION,**
**Tommy Dollar and others,**
**Petitioners,**

v.

**Clyde BLOYED, Ron Godbey, and**
**Regina Godbey, Respondents.**

No. 94–0777.

Supreme Court of Texas.

Argued March 21, 1995.

Decided Feb. 9, 1996.

Franklin Jones, Jr., Marshall, Rosemary T. Snider, Marshall, Sam Baxter, Marshall, Joe R. Greenhill, Austin, Larry F. York, Austin, Bob E. Shannon, Austin, Patrick O. Keel, Austin, Timothy J. Crowley, Houston, Eugene A. Cook, Houston, J. Andrew Langan, Chicago, IL, W. Richard Davis, Dallas, Ernest R. Higginbotham, Dallas, P. Michael Jung, Dallas, Lee A. Schutzman, Detroit, MI, Edward C. Wolfe, Detroit, MI, Robert B. Ellis, Chicago, IL, Gael Plauché, Houston, for petitioners.

Stephen Gardner, Dallas, Roger L. Mandel, Dallas, Marc R. Stanley, Dallas, for Respondents.

Justice CORNYN delivered the opinion of the Court, in which all Justices join.

The question in this appeal is whether the trial court abused its discretion under Texas Rule of Civil Procedure 42(e) when it approved the settlement of a class action involving about 645,000 owners of certain pickup trucks manufactured by General Motors Corporation (GMC). The plaintiffs claim that the trucks' side-saddle gas tanks, located outside the vehicle frame, make the trucks particularly vulnerable to combustion and fire after side impact. The plaintiffs sought only economic damages of diminished market value or cost of repair; the plaintiffs specifically excluded claims for personal injury or death.

The court of appeals determined that the trial court abused its discretion by approving a settlement agreed to by the class representatives, class counsel, and GMC. 881 S.W.2d 422. We granted the applications for writ of error filed by GMC and the class representatives challenging the court of appeals's conclusions that the settlement was not fair, adequate, and reasonable and that the notice to the class was deficient because it did not disclose the amount of attorney's fees that class counsel requested. We affirm the judgment of the court of appeals and remand this case to the trial court for further proceedings in accordance with this opinion.

## I. Facts

On November 17, 1992, Tommy Dollar and six other people filed this action against GMC and others in Harrison County on behalf of all Texas residents who purchased, on or before October 16, 1992, full-size Chevrolet and GMC C/K or R/V series pickup trucks manufactured between 1973 and 1991. Four plaintiffs moved for certification of their case as a class action. Before the trial court ruled on the motion, however, the parties announced that they had reached a tentative settlement. The parties signed the

settlement agreement on July 19, 1993. On that same day, GMC settled a national class action, which included GMC truck owners in every state but Texas, on terms that were nearly identical to those in this case. *Compare* 881 S.W.2d at 427 n. 2, *with In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 780–81 & n. 4 (3d Cir.), *cert. denied sub nom. General Motors Corp. v. French,* — U.S. —, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). In a well-reasoned and comprehensive opinion, the Third Circuit Court of Appeals set aside the national settlement and remanded the case due to the federal district court's failure to make the factual findings required to certify the class.

On July 20, 1993, the trial court certified the Texas case as a class action for settlement purposes only and ordered that notice of the terms of the proposed settlement be mailed to 645,312 registered Texas truck owners. Notices were also published in USA TODAY and the MARSHALL NEWS MESSENGER. The notice instructed class members who wished to opt out of the settlement class to send a written request to the district clerk by October 5, 1993. Class members wishing to object to the settlement were instructed to write to the district clerk, class counsel, and GMC by October 5, 1993. Class members Clyde Bloyed, Ron Godbey, Regina Godbey, and others filed objections to the proposed settlement. After considering affidavits and arguments of counsel, the trial court overruled all objections and rendered judgment approving the settlement on November 2, 1993.

Under the terms of the settlement approved by the trial court, each class member, upon written request, is entitled to receive a $1,000.00 certificate to use toward the purchase of a new Chevrolet or GMC truck or van. Each class member must redeem the certificate within fifteen months after class member receives notice that the certificates are available. The class member can use the certificate toward the down payment on a new vehicle, and the class member need not disclose an intent to use the certificate until striking his best deal with the dealer. The class member can also use the $1,000.00 certificate in conjunction with any marketing incentives or promotional offers available through GMC or General Motors Acceptance Corporation (GMAC).

Alternatively, the class member can transfer the certificate to an immediate family member who resides with the class member. Or, the class member can transfer the $1,000.00 certificate with the title to the settlement class vehicle, that is, to a third party who purchases the settlement class member's vehicle.

In lieu of a $1,000.00 certificate, and without transferring title to the settlement class vehicle, a class member may instead request that GMC issue a nontransferable $500.00 certificate to any third party except a GMC dealer or its affiliates. This $500.00 certificate is redeemable with the purchase of a new C/K series GMC or Chevrolet full-size pickup truck or its replacement model. The class member cannot use the $500.00 certificate in conjunction with any GMC or GMAC marketing incentive and is subject to the same fifteen-month redemption period.

In return, the settlement releases GMC from all claims related to the fuel system design of the trucks, excluding all claims arising out of any vehicular crash resulting in personal injury or death.

## II. The Class Action's Uneasy Role in the Adversary System

Class action suits furnish an efficient means for numerous claimants with a common complaint to obtain a remedy "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages." *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980); *see also* 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1.06, at 1–20 (3d ed. 1992) (listing the objectives of class actions as: promoting efficiency, protecting defendants from inconsis-

tent verdicts, protecting the rights of absent class members, allowing recovery by small claimants, and enforcing laws through private attorney general suits) [hereinafter NEWBERG & CONTE]. Class actions also facilitate "the spreading of litigation costs among numerous litigants with similar claims." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 403, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980). We do not doubt the salutary nature of this procedural device under appropriate circumstances. But, class actions are extraordinary proceedings with extraordinary potential for abuse. Therefore, among other prerequisites, before certifying a case as a class action, the trial court must first determine "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." TEX.R.CIV.P. 42(b)(4).

■ One of the foremost objectives of Rule 42 is to protect the interests of absent class members. The law generally requires notice of a lawsuit and an opportunity for a hearing before any person may be bound by a court's judgment. *E.g., Cunningham v. Parkdale Bank,* 660 S.W.2d 810, 813 (Tex. 1983). By contrast, "[t]he judgment in an action maintained as a class action ... whether or not favorable to the class, shall ... be binding upon all those whom the court finds to be members of the class and who received notice as provided in subdivision (c)(2)." TEX.R.CIV.P. 42(c)(3). The United States Supreme Court has made it clear that due process requires adequate representation of the interests of absentee class members that the judgment will bind. *Hansberry v. Lee,* 311 U.S. 32, 42–43, 61 S.Ct. 115, 118–19, 85 L.Ed. 22 (1940).

In a class action, the absentee members of the class may not even learn of the proposed judgment until a tentative settlement has been struck on their behalf by the defendant, the class representative, and class counsel. When notice of a proposed settlement and notice of the class action are sent simultaneously, the absent class members may perceive it as a fait accompli. *Mars Steel Corp.*

*v. Continental Ill. Nat'l Bank & Trust Co.,* 834 F.2d 677, 680–81 (7th Cir.1987). The potential for conflicts of interest under these circumstances is substantial and to some extent unavoidable.

During the last decade scholars have expressed growing concern about the conflicts that may arise between the class and its counsel: "[T]hese attorneys are not subject to monitoring by their putative clients, they operate largely according to their own self-interest, subject only to whatever constraints might be imposed by bar discipline, judicial oversight, and their own sense of ethics and fiduciary responsibilities." Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation,* 58 U.CHI.L.REV. 1, 7–8 n. 4 (1991); *see also* John C. Coffee, Jr., *Rethinking the Class Action,* 62 IND.L.J. 625, 628–29 (1987) (listing several factors that have contributed to entrepreneurial class action litigation, including the relatively low cost of filing dubious class action suits, the large amounts defendants are willing to pay in settling these suits, and the incentive for class counsel to invest little time and effort in protecting the absent class members); John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action,* 54 U.CHI. L.REV. 877, 878, 878–79 (1987) (outlining proposed rule changes that would "manipulate the incentives that the law holds out so as to motivate" class counsel to defend the absent class members as they would any other client); Kenneth W. Dam, *Class Actions: Efficiency, Compensation, Deterrence, and Conflict of Interest,* 4 J.LEGAL STUD. 47, 61 (1975) (coining the phrase "lawyer-entrepreneur" in reference to class counsel). Judge Posner has noted that

the absence of a real client impairs the incentive of the lawyer for the class to press the suit to a successful conclusion. His earnings from the suit are determined by the legal fee he receives rather than the size of the judgment. No one has an economic stake in the size of the judgment except the defendant, who has an interest

in minimizing it. The lawyer for the class will be tempted to offer to settle with the defendant for a small judgment and a large legal fee, and such an offer will be attractive to the defendant, provided the sum of the two figures is less than the defendant's net expected loss from going to trial. Although the judge must approve the settlement, the lawyers largely control his access to the information—about the merits of the claim, the amount of work done by the lawyer for the class, the likely damages if the case goes to trial, etc.—that is vital to determining the reasonableness of the settlement.

RICHARD A. POSNER, AN ECONOMIC ANALYSIS OF LAW 570 (4th ed. 1992) [hereinafter POSNER, ECONOMIC ANALYSIS].

The potential for abuse of the class action procedure points out the importance of the trial court's obligation to determine that the protective requirements of Texas Rule 42 are met when it approves a class action settlement. While the trial court generally plays a relatively detached role in most civil proceedings, in a class action the court is the guardian of the class interest. *Weinberger v. Kendrick*, 698 F.2d 61, 69 n. 10 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir.), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982); *Piambino v. Bailey*, 610 F.2d 1306, 1327 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); 2 NEWBERG & CONTE, § 11.41, at 11–93 to 11–94. The trial court bears the burden under Rule 42 to police the proceeding to minimize conflicts of interest and, primarily, to protect absent class members:

The drafters designed the procedural requirements of Rule 23, especially the requisites of subsection (a), so that the court can assure, to the greatest extent possible, that the actions are prosecuted on behalf of the actual class members in a way that makes it fair to bind their interests. The rule thus represents a measured response to the issues of how the due process rights of absentee interests can be protected and how absentees' represented status can be reconciled with a litigation system premised on traditional bipolar litigation.

*In re General Motors Corp.*, 55 F.3d at 785.[1]

The trial court must assume its role as guardian of the class not only in approving class settlements, but also in deciding whether to certify a class in the first place. This means that Rule 42's certification requirements of numerosity, commonality, typicality, and adequacy of representation must always be met, even when cases are settled before certification of the class: "Without determining that the class claims are common and typical of the entire putative class and that the class representatives and their counsel are adequate representatives, we have no assurance that the district court fully appreciated the scope and nature of the interests at stake." *In re General Motors Corp.*, 55 F.3d at 797; *see also* 2 NEWBERG & CONTE § 11.27, at 11–50 ("The actual class ruling is deferred in [settlement class actions] until after hearing on the settlement approval, following notice to the class. At that time, the court in fact applies the class action requirements to determine whether the action should be maintained as a class action . . . .").

■ Settlement classes, as we have indicated, raise special concerns. In setting aside the national class action settlement, the Third Circuit pointed out that:

Settlement classes . . . make it more difficult for a court to evaluate the settlement by depriving the judge of the customary structural devices of Rule 23 and the presumptions of propriety that they generate. Ordinarily, a court relies on class

---

1. In our analysis of Texas Rule of Civil Procedure 42 we are guided by analysis of Federal Rule of Civil Procedure 23, from which Rule 42 was

derived. *See* 1 McDonald, TEXAS CIVIL PRACTICE § 5:54, at 567 n. 445 (1992).

status, particularly the adequacy of representation required to maintain it, to infer that the settlement was the product of arm's length negotiations.... Where the court has not yet certified a class or named its representative or counsel, this assumption is questionable.

.... In particular, settlement classes create especially lucrative opportunities for putative class attorneys to generate fees for themselves without any effective monitoring by class members who have not yet been apprised of the pendency of the action.

*In re General Motors Corp.*, 55 F.3d at 787–88; *see also* 2 NEWBERG & CONTE, § 11.09, at 11–14 (discussing the need for trial court oversight to minimize conflicts of interest between the class and class counsel). Some commentators have even warned that the class action device may be used in an offensive and collusive manner in order to foreclose future individual claims. *See, e.g.*, John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM.L.REV. 1343, 1350 (1995) ("Rather than serving as a vehicle by which small claimants can aggregate their claims in order to make litigation economically feasible ..., the mass tort class action now often provides a means by which unsuspecting future claimants suffer the extinction of their claims even before they learn of their injury."). The gravity of these concerns mandates that a trial court independently determine that the requirements of Rule 42 have been scrupulously met, in their entirety, before approving any class action settlement. *See In re General Motors Corp.*, 55 F.3d at 795–96.

### III.  The Court of Appeals's Error

■ Under Rule 42(e), the trial court is charged with the responsibility of determining that the settlement is fair, adequate, and reasonable. *Ball v. Farm & Home Sav. Ass'n*, 747 S.W.2d 420, 423 (Tex.App.—Fort Worth 1988, writ denied) (citing *In re Corrugated Container*, 643 F.2d at 207). Approval of a class action settlement is within the sound discretion of the trial court and should not be reversed absent an abuse of that discretion. *Crouch v. Tenneco, Inc.*, 853 S.W.2d 643, 646 (Tex.App.—Waco 1993, writ denied); *Ball*, 747 S.W.2d at 423. In other words, in reviewing the trial court's judgment, the appellate court must not merely substitute its judgment for that of the trial court.

■ Factors the court should consider in determining whether to approve a proposed settlement are: (1) whether the settlement was negotiated at arms' length or was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings, including the status of discovery; (4) the factual and legal obstacles that could prevent the plaintiffs from prevailing on the merits; (5) the possible range of recovery and the certainty of damages; (6) the respective opinions of the participants, including class counsel, class representatives, and the absent class members. *Ball*, 747 S.W.2d at 423–24 (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982)). Put another way, the trial court must examine both the substantive and procedural aspects of the settlement: (1) whether the terms of the settlement are fair, adequate, and reasonable; and (2) whether the settlement was the product of honest negotiations or of collusion. *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Those defending the settlement must show that the evidence related to these factors supports approval of the settlement.

■ The trial court correctly analyzed the fairness of this settlement according to the six *Ball* factors. First, the trial court found that the agreement had been reached as a result of honest, arms' length negotiations and that there was no evidence of collusion or fraud. Second, the trial court found that the case involved extremely complex issues of liability and damages and that a jury trial would consume considerable time and re-

sources. Third, the trial court also found that sufficient discovery had been conducted to allow the parties to make an informed decision about the relative merits of the case and the settlement. Fourth, the trial court found that only a fraction of one percent of the class had filed any objection to the terms of the settlement. *See* 881 S.W.2d at 428–30.

While the court of appeals acknowledged that these factors favored approval of the settlement, it nevertheless concluded that "[t]he trial court abused its discretion in approving the proposed settlement because this settlement is not fair, adequate, or reasonable to the class members as a whole, on whose behalf the action was initiated." 881 S.W.2d at 433. In essence, the court of appeals overturned the settlement because it decided that the potential windfall to GMC outweighed all the reasons supporting approval.

The primary basis for this conclusion was the apparent disparity between the value of the settlement to members of the class and the potential economic benefit to GMC. The court of appeals's opinion illustrates several areas of concern with the settlement in this case. First, the alleged defect in the gas tank design would not be corrected, leaving more than 600,000 class members driving what are allegedly unreasonably dangerous vehicles. Second, more than half of the class would be unable or unwilling to redeem the coupons in connection with the purchase of a new GMC truck within fifteen months of receiving the certificate.[2] Thus, more than half of the class would receive no benefit at all from the coupons, although *all* class members would be bound by the settlement. Third, the court objected to a settlement requiring claimants to pay up to $30,000.00 for a new truck, in order to receive a $1,000.00 benefit. In essence, the court of appeals questioned whether having to pay such a price for a relatively small rebate was fair. Fourth, as we have mentioned, the court worried that the coupons would translate into a sales bonanza for GMC. Evidence

revealed that even with the $1,000.00 rebate provided by the certificates, GMC could expect a profit of $2,000.00–$3,000.00 on each new truck sale. Assuming 46% of the 645,-000 claimants purchased new trucks, GMC stood to recover tremendous profits from this settlement.

We nevertheless agree with GMC and the class representatives that the court of appeals erred in holding that the trial court's approval of the settlement was an abuse of discretion. Although the settlement may well have translated into higher truck sales for GMC, the agreement was by no means one-sided in light of significant problems the class members faced on the merits of their claims.

In this vein, the trial court made the following findings of fact:

14. The Court finds that there are substantial legal issues, including the statute of limitations and other issues, that make the likelihood of maintaining class certification through trial and recovery for plaintiffs uncertain.

15. The Court finds that there is uncertainty about the Plaintiffs' ability to prove liability.

16. The Court finds that there is uncertainty about Plaintiffs' ability to prove damages.

While we appreciate the uncertain value of this noncash settlement, the court of appeals erred in its preoccupation with the benefits of the settlement to GMC and its apparent disregard of the difficulties the trial court found with the plaintiffs' case on the merits. *See In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 n. 44 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979) (stating that "the strength of the plaintiff's case on the merits balanced against the amount offered" is the crucial factor in evaluating the fairness of the settlement). As the trial court found, none of the class members reported any

---

**2.** The class's expert testified that 46% of the Texas class members would use the coupons,

while the objectors' expert contended that only 10% would do so.

problems with the operation of their trucks, the market value of the trucks as measured by the *Kelley Blue Book* had not declined relative to comparable trucks manufactured by other companies, and no expert offered a reliable means of curing the alleged defect. *See* 881 S.W.2d at 429. In short, the individual class members faced considerable problems with proving *any* damages at all.

Furthermore, there was a strong likelihood that a large proportion of the class members' claims against GMC would have been barred by the statute of limitations. The side-saddle gas tank design had been advertised as early as 1973 and had been the subject of litigation since the early 1980s. Even if the discovery rule applied here, which we do not decide, the statute of limitations presented a serious impediment to recovery for almost all of the class members because this suit was not filed until November 1992.

It is also noteworthy that the trial court's assessment of the Texas plaintiffs' claims was echoed by the federal district court in the national class action, *In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 846 F.Supp. 330, 336 (E.D.Pa.1993) ("Perhaps the greatest weakness in the plaintiffs' case is the lack of proof of economic damages."), *rev'd*, 55 F.3d 768 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995), and by the Third Circuit. *In re General Motors Corp.*, 55 F.3d at 814–17.

The class representatives apparently decided that accepting the certificates was preferable to proceeding with a lengthy lawsuit based on dubious evidence of damages, while GMC apparently opted for providing the certificates rather than exposing itself to continuing defense costs and potentially greater liability. In other words, both sides compromised. " '[I]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes.' " *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977) (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y. 1972)). In deciding that the potential windfall to GMC outweighed the reasons support-

ing the class compromise, we hold that the court of appeals substituted its judgment for that of the trial court as to what constituted a fair, adequate, and reasonable settlement.

## IV. Notice of Attorney's Fees

Notwithstanding our conclusion that the court of appeals improperly substituted its judgment for that of the trial court in determining the fairness of the other provisions of the settlement, we nevertheless agree with the court of appeals that the settlement must be set aside because the class members did not receive adequate notice of all of the material terms of the proposed settlement, specifically the projected amount of attorney's fees and expenses.

■ After certifying the Texas claimants as a class for settlement purposes, the trial court set a fairness hearing for October 27, 1993. The court then ordered class counsel to notify all class members of the terms of the settlement and of their rights to opt out of the settlement or object to its terms. The notice contained only the following mention of attorney's fees:

> If the Court approves the settlement of the case, the Court will determine an award of attorneys' fees and reimbursement of costs and expenses, which would be paid solely by General Motors and would not reduce, directly or indirectly, any of the Settlement's benefits to Class members. GM reserves the right to oppose and appeal any application it deems unreasonable.

Class counsel mailed this notice to the class members in August 1993 and then filed its request for fees with the trial court on October 7, 1993. This notice was insufficient.

■ As we explained in Section II of this opinion, the potential conflict between absent class members and class counsel is one of the serious problems with class action settlements. We, therefore, hold that class action settlement notices must contain the maximum amount of attorney's fees sought by class counsel and specify the proposed method of calculating the award. The source of

the fees—whether the fees are subtracted directly from the funds to be distributed among the class members or, as here, are paid by the defendant in an otherwise non-cash settlement—is irrelevant. The class action settlement, including both the benefits conferred on the class and the fees awarded to class counsel, represents a total dollar figure that the defendant is willing to pay to avoid litigation. POSNER, ECONOMIC ANALYSIS at 570 (positing that defendants would approve a settlement with a small benefit to the class and a large fee for class counsel "provided the sum of the two figures is less than the defendant's net expected loss from going to trial"). Notwithstanding the trial court's finding that the attorney's fees awarded would not affect the benefits provided to the class members, we agree with the court of appeals that "[a]ttorneys' fees, even though they may not be technically deducted from the amount paid to the litigants, represent an integral part of the overall amount that the settling party is willing to pay, and as such, they have a direct effect on the net amount that will ultimately be paid to the litigants." 881 S.W.2d at 435–36.

Other courts have invalidated class action settlements based on a failure to notify the class members of the potential size of the class counsel's fee award. *See, e.g., Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d at 1130. Moreover, any contention that providing fee information in a class action notice would be impracticable is belied by the routine inclusion of such information in class action notices. *See, e.g., Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir. 1993), *cert. denied, Reilly v. Tucson Elec. Power Co.,* — U.S. —, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994); *In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 568 (7th Cir.1992); *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 770 (11th Cir.1991); *Maher v. Zapata Corp.,* 714 F.2d 436, 457 n. 38 (5th Cir.1983); *Mendoza v. United States,* 623 F.2d 1338, 1351–52 (9th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981); *In re Ames Dep't Stores, Inc. Debenture Litig.,* 150 F.R.D. 46, 52 (S.D.N.Y.1993); *In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 527 (E.D.Pa.1990). Notice of the attorney's fees sought by class counsel is essential because, without such notice, class members cannot "determine the possible influence of attorneys' fees on the settlement in considering whether to object to it." *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d at 1130. Without this vital information, class members cannot make informed decisions about their right to challenge the fee award at the hearing, including the allocation of the settlement proceeds between the class and its attorneys.

## V. On Remand

■■■■ The trial court determined that the settlement in this class action was fair, adequate, and reasonable based solely on affidavits. In *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 (Tex.1992), we wrote that as a general rule, "contested issues are decided after a plenary hearing, that is, a hearing at which witnesses present sworn testimony in person or by deposition rather than by affidavit." Even when deciding controverted material facts in a matter for which the Legislature has prescribed summary disposition, we require trial courts to conduct an evidentiary hearing to resolve those disputed facts. *Id.* Given the heightened responsibility of the trial court in approving class action settlements mandated by Rule 42(e), we think that a plenary hearing, with the opportunity for questioning by the court and vigorous cross-examination by counsel representing objecting class members, should be the general rule.

■■■■ In conducting a plenary hearing on a proposed class action settlement, the trial court must resolve two primary issues: (1) whether to certify the class under the Rule 42 prerequisites of numerosity, commonality, typicality, and adequacy of representation; and, if so, (2) whether the set-

tlement is fair, adequate, and reasonable, considering the six *Ball* factors and the amount of attorney's fees to be awarded class counsel.[3] It is important to understand that these two issues are separate and that findings approving the settlement as fair cannot substitute for the certification findings required by Texas Rule 42. *See In re General Motors Corp.*, 55 F.3d at 795–96 (holding that findings regarding the fairness of the settlement cannot serve as "a surrogate for" certification findings because "the settlement approval inquiry is far different from the certification inquiry"); 2 NEWBERG & CONTE, § 11.27, at 11–50 (noting that the trial court must still make certification findings in the settlement class action context).

The trial court in this case made no determination regarding numerosity, commonality, typicality, and adequacy of representation, and the answers to the questions raised by these requirements are not obvious. For example, one striking feature of the settlement is that no fleet owner was designated as a class representative. There appears to be a serious intraclass conflict between individual truck owners and fleet owners, such as governmental entities, who will likely be constrained by competitive bidding and other purchasing requirements before they can take advantage of the settlement. *See In re General Motors Corp.*, 55 F.3d at 781, 800–01. Concerns such as this led the Third Circuit to overturn the settlement in the national class action. *Id.; see also Piambino v. Bailey*, 610 F.2d 1306, 1329–30 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980) (vacating class certification for reconsideration of sharp conflicts of interest between two categories of plaintiffs).

While it did not conduct a plenary hearing on the Rule 42 requirements, the trial court did find that "there is uncertainty as to whether a class action could be properly certified and maintained through trial because there are potentially substantial individual questions of fact and law and obstacles to the manageability of the action on a class basis." If the trial court believed this to be the case, it should not have certified the class or approved the settlement as it did.

Both class action jurisprudence generally, *see* 2 NEWBERG & CONTE, § 11.65, at 11–183, and Texas law specifically impose fiduciary duties on attorneys in their relationship with their clients. This fiduciary relationship requires a full and fair disclosure of the terms of a proposed settlement. TEX.DISCIPLINARY R.PROF.CONDUCT 1.02, 1.03, reprinted in TEX. GOV'T CODE, tit. 2, subtitl. G app. (State Bar Rules art. X, § 9). As we have already indicated, the divergent economic incentives of the class and its counsel create conflicting interests that warrant special scrutiny. *See* Andrew Rosenfield, *An Empirical Test of Class–Action Settlement*, 5 J.LEGAL STUD. 113, 115 (1976) ("The crucial point is that costly transactions drive a wedge between the objectives of the class and the objectives of the attorney representing the class, thereby creating the possibility of advantageous trades among the class attorney and the defendant."). In other words, the clear divergence of financial incentives to settlement as between the class and class counsel creates the "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for a red-carpet treatment on fees." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991); *see also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 224 (2d Cir.1987) ("The test to be applied is whether, at the time a fee sharing agreement is reached, class counsel are placed in a position that might endanger the fair representation of their clients and whether they will be compensated on some basis other than for legal services performed.").

▆ In the event the parties on remand strike a new settlement that is approved by the trial court, then after appropriate notice

---

**3.** A fairness hearing should not be a full trial on the merits, *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d at 1132 n. 44, but rather a preliminary assessment of the strength of the class's case.

to class members, the court must determine the amount of fees to award. Generally, there are two methods for calculating fees in the class action context: the percentage method, when the value of the settlement is subject to reasonably clear estimation, and the lodestar method, which calculates fees by multiplying the number of hours expended by an appropriate hourly rate determined by a variety of factors, such as the benefits obtained for the class, the complexity of the issues involved, the expertise of counsel, the preclusion of other legal work due to acceptance of the class action suit, and the hourly rate customarily charged in the region for similar legal work. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).

In this case, the trial court chose the percentage method and made the following finding regarding the amount of the attorney's fees award:

> 29. The Court concludes that the substantial value of the benefit secured for the class as a result of the efforts of counsel of record for the Plaintiffs and the class, the substantial hours devoted by counsel to the litigation, the nature and complexity of the issues involved in this case, the extent of the responsibilities assumed by counsel for Plaintiffs, and the level of skill and experience of class counsel support the award of nine million dollars as reasonable attorneys' fees for necessary services, that five hundred three thousand two hundred ninety-six dollars in expenses was reasonably incurred by counsel and necessary in prosecuting this case, and that the award of attorneys' fees and expenses is properly assessed against General Motors Corporation under the terms of the Agreement of Settlement. The Court finds that the attorneys' fees awarded represent less that ten percent of the value of the settlement based on consideration of the Affidavits

submitted by Plaintiffs' experts and by certain objectors.

A comparison of the attorney's fees awarded both in the national class action and in this case raises serious questions about the methodology used by the trial court to set the amount of attorney's fees. In the national class action, the federal district court found the value of the settlement, which involved 5.7 million vehicles,[4] to be approximately between $1.98 billion and $2.18 billion, based upon projections that thirty-four to thirty-eight percent of the class would use the $1,000.00 certificates and eleven percent would sell them for $500.00. *In re General Motors Corp.*, 55 F.3d at 807. Twenty-five law firms [5] in the national class action received a fee award in the amount of $9.5 million. In the Texas case, however, just two law firms received $9 million in attorney's fees plus costs, even though the Texas case involved roughly ten percent of the number of vehicles involved in the settlement of the national class action.

The lodestar method of calculating attorney's fees in class actions originated with *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973), *appeal following remand*, 540 F.2d 102 (3d Cir.1976) (listing four factors to be used in awarding attorney's fees). The lodestar method, though, has been criticized for, among other things, providing a financial incentive for counsel to expend excessive time in unjustified work and creating a disincentive to early settlement. *Court Awarded Attorney Fees*, 108 F.R.D. 237, 246–49 (3d Cir. Task Force 1985).

■■ Both the percentage method and the lodestar method have their strengths and weaknesses, depending on the facts of the case. We do not here dictate any single method for the award of attorney's fees in a

---

4. 6,450 owners objected to the national class action settlement and 5,203 opted out. *In re General Motors Corp.*, 55 F.3d at 813 n. 32.

5. This is the undisputed contention of amici Public Citizen Inc. and the Consumer Federation of America, citing Docket Entry # 107 *In Re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, MDL 961 (E.D.Pa.).

class action settlement, but leave that to the sound discretion of the trial court. As we have noted, when considering whether to approve the settlement of a class action, including the award of attorney's fees, the trial court should be particularly aware of the conflicting interests of the class and its counsel. The defendant's economic concerns consist only of the total value of the settlement, including attorney's fees and expenses. Unlike class counsel, the defendant has no economic interest in the allocation of settlement funds between the class members and counsel for the class. Thus, it is incumbent on the trial court to determine that the settlement's award of attorney's fees does not unfairly diminish the value of the settlement fund generated for the class's benefit.

In that connection, the trial court should require evidence that the attorney's fees sought by class counsel in this case were necessary to obtain benefits identical to those available in the parallel national class action. While valid reasons may exist in certain circumstances for proceeding with a separate state court class action instead of joining a national class action in federal court, nothing in the record here reveals the *need* for this separate class action beyond the single unexplained reference in Petitioner Dollar's Post–Submission Brief to counsel's "serious concerns about subject matter jurisdiction in the federal court."

Regardless of the method by which attorney's fees are calculated, the terms of the nonmonetary settlement in this case raise additional concerns about the conflicting interests of class counsel and class members, because the value of the settlement can only be roughly estimated. Although the trial court found that the attorney's fees awarded here represent less than ten percent of the approximate value of the settlement, under a lodestar approach the fees awarded amount to a rate of approximately $1,500.00 per hour.[6] At a minimum, we think that on remand any fee awarded on a percentage basis should be tested against the lodestar

approach to prevent grossly excessive attorney's fee awards and to minimize the inherent conflict between class counsel and the class members.

For the foregoing reasons, we affirm the judgment of the court of appeals. The cause is remanded to the trial court for further proceeding consistent with this opinion.

6. Class counsel asserted that they had spent 6,000 hours on this case. 881 S.W.2d at 436.

Thus, an hourly rate of $1,500.00 for 6,000 hours would result in a $9 million fee award.